**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: February 20, 2024

S23A1096.  BLASH v. THE STATE.

BOGGS, Chief Justice.

Appellant Demarcus Deshawn Blash challenges his 2021 convictions for malice murder and other offenses arising out of the shooting deaths of Jain Marie Williams and her husband Wendell Everett Williams. Appellant contends that the evidence was not sufficient and that the trial court erred in denying his motion for new trial under the "general grounds" in OCGA §§ 5-5-20 and 5-5-21. Appellant also argues that the trial court abused its discretion when it overruled his objection to the introduction of his jail phone call recordings and to expert testimony regarding gang language in those recordings. Based on these arguments, Appellant seeks a new trial. Appellant further asserts that the trial court plainly erred by failing to sentence Appellant "under Georgia law." Finally,

Appellant argues that he was deprived effective assistance of counsel due to his trial counsel's failure to object when the trial court allegedly did not sentence Appellant according to Georgia law. Based on his last two arguments, Appellant seeks resentencing by a different trial judge.[1]

---

[1] The crimes occurred between April 22 and April 23, 2018. On June 4, 2018, a Dodge County grand jury indicted Appellant, Martez Gordon, Gary Pennamon, and Kojack Thomas, Jr. for two counts of malice murder, two counts of felony murder, home invasion, two counts of armed robbery, two counts of aggravated assault, burglary in the first degree, possession of a firearm during the commission of a felony, and three counts of theft by taking. Alija Pennamon was also indicted for one count of theft by taking. Appellant's co-defendants either pled guilty or were tried separately from him. At a trial from April 27 to 30, 2021, a jury found Appellant guilty of all counts, except one count of theft by taking for which the State had sought an order of nolle prosequi prior to trial. The trial court sentenced Appellant to serve concurrent sentences of life in prison without the possibility of parole for the malice murders of Jain and Wendell Williams and life in prison with the possibility of parole for home invasion and armed robbery, to run concurrently with each other and consecutively to the malice murder sentences. Additionally, the trial court sentenced Appellant to consecutive terms totaling forty years for burglary in the first degree, two counts of theft by taking, and possession of a firearm during the commission of a felony. The felony murder counts were vacated by operation of law, and the trial court merged the aggravated assault counts into the malice murder convictions. On May 13, 2021, Appellant filed a timely motion for new trial, which he amended on June 17, 2022, with new counsel. After an evidentiary hearing on June 27, 2022, the trial court denied the motion on July 8, 2022. Appellant filed a notice of appeal on August 3, 2022, but this Court dismissed the appeal because one theft-by-taking count remained pending in the trial court. See Case No. S23A0339 (Dec. 20, 2022) (Order dismissing appeal). Later, after the entry of this Court's dismissal order but before the filing of the remittitur in the trial court, the trial court entered

2

We conclude that the evidence was constitutionally sufficient to authorize Appellant's convictions because he and his co-defendants planned the crimes and he was a party to them; that the trial court properly exercised its authority in denying Appellant's motion for new trial on the general grounds; that the trial court did not plainly err in concluding that the jail call recordings were properly authenticated and did not abuse its discretion in concluding that the recordings were not unduly prejudicial; and that the trial court did not abuse its discretion in allowing expert testimony interpreting gang terminology because the testimony helped the jury understand the specialized language in the recordings. We also conclude that Appellant has not preserved his claimed sentencing error for appellate review because he failed to object and because plain error analysis does not apply to claims like these; that Appellant's sentences are not void because they meet the

---

the nolle pros order on January 3, 2023, as to the pending theft-by-taking count. On April 13, 2023, the trial court filed the remittitur, and Appellant filed an amended notice of appeal on the same day. The case was docketed in this Court to the August 2023 term and submitted for a decision on the briefs.

statutory ranges under Georgia law; and that trial counsel was not constitutionally ineffective because Appellant has not demonstrated prejudice due to any failure to object. Accordingly, we affirm Appellant's convictions. However, we vacate the sentences for burglary and one count of theft by taking because these counts should have merged with home invasion and armed robbery, respectively.

Viewed in the light most favorable to the verdicts, the evidence at trial showed as follows. We begin by generally summarizing the evidence in the record, synthesizing pretrial statements by Appellant's co-defendants with testimony and other evidence presented at trial. On April 22, 2018, Appellant spent time with his friends and co-defendants Gary Pennamon, Kojack Thomas, Jr., and Martez Gordon. That day, Appellant shared his idea to form a gang called "Skullface" made up of individuals who "got bodies." Kojack knew that the Williamses kept guns and money in their home because he previously spent time with them; as a result, he suggested that the group steal from them. The group drove to the

4

road on which the Williamses lived, parked down the road away from the house, and walked to the house. Around 9:00 or 10:00 p.m., Appellant and Gary entered the home while Martez and Kojack briefly remained outside before entering. Appellant fatally shot Wendell once using a nine-millimeter firearm. Members of the group fatally shot Jain a total of three times. The group afterward searched the house, taking firearms and the Williamses' 2005 Chevrolet Impala. Alija Pennamon, Gary's nephew, testified at trial that he saw a video the group recorded before leaving the house in which they bragged about the killings. Appellant appeared in the video. After recording the video, the group left the home with the Impala.

Early the next morning on April 23, 2018, around 4:00 a.m., Gary texted Alija asking for marijuana. Alija responded that he had some to share, so Gary went with Martez in the Impala to Alija's house. Alija got into the car with Gary and Martez, rode with them to another location to acquire more marijuana, and tried to leave after Gary said, "[W]e killed two people." Gary refused to let Alija

5

leave. Eventually, the group also picked up Kojack, and Alija began driving the Impala. As Alija drove quickly down a dirt road, he lost control of the car and crashed it into a ditch with Gary, Kojack, and Martez inside. Gary texted Isaiah Mason asking for a ride. Isaiah drove to Gary's location but could not find him.

Meanwhile, Robert Wilkerson, a constable with the Dodge County Magistrate Court, was responding to a report of suspicious persons in the same area. Constable Wilkerson turned onto the dirt road and came upon four young men; two took off running to the right (one carrying a rifle), and two went to the left. He kept driving down the road without arresting the four young men and eventually saw the wrecked Impala. At the same time, Deputy Jonathan Wright of the Dodge County Sheriff's Office responded to the same area to a report of a vehicle in a ditch. He came upon Isaiah, who said that he was there to pick up his brother.[2]

On April 25, 2018, concerned neighbors who had not seen the

---

[2] Isaiah testified that he refers to Gary as his "brother" even though they are not biological brothers.

Williamses in a few days called 911 to request a welfare check. Deputy Dustin Rogers of the Bleckley County Sheriff's Office responded to the Williamses' home, where he discovered their bodies. A concerned neighbor who met Deputy Rogers at the home pointed out that the Williamses' Impala "was gone and that everything was just awry."

Following their arrest, Martez and Gary gave recorded statements to law enforcement regarding the events we summarized above, which we recount in more detail below. In one recorded interview, Martez stated that Appellant shared with the group the day of the murders that he wanted to form a "Skullface" gang where each member of the gang "got bodies"; that the group said they would "hit this lick"; that the group shot Jain multiple times; that Appellant shot Wendell once using a nine-millimeter firearm; and that the group stole items including firearms and a vehicle from the Williamses' home. In another recorded interview, Martez stated that Kojack proposed the idea to the group that they rob the Williamses to get their guns; that the group shot Jain multiple times; that

7

Appellant shot Wendell once; that the group stole guns from the house; and that Appellant and others looked around the Williamses' home for items to steal. In Gary's recorded statement, Gary asserted that the group discussed "hitting a lick"; that Appellant was present when the murders occurred; that someone shot Jain; and that Appellant shot Wendell.

Later on, Martez, Gary, and Kojack pled guilty to the murders and testified at trial; the recordings of Martez's and Gary's interviews with law enforcement officers were also played at trial. Martez testified that he shot both victims; Gary testified that he shot Jain and that Kojack shot Wendell; and Kojack testified that he did not know who shot the Williamses but that Appellant entered the house with a firearm.

While awaiting trial, Appellant made jail phone calls that were recorded and played at trial in which Appellant attempted to influence witnesses. For example, Appellant asked for "the math" of a co-defendant he wanted to contact in another prison because the co-defendant had "stacked" on him, and Appellant wanted to "reach

8

out" to that co-defendant. In another call, Appellant asked if the person he was calling knew individuals at Coffee County Correctional Facility where Gary was detained or at Phillips State Prison where Martez was detained and discussed that Gary was "dead." Appellant also called his mother, asking her not to identify him in surveillance videos that the State planned to play at trial that showed the group together at a gas station near the time of the murders, and he informed her that he planned to "play a dirty game." The State played these recordings at trial following authentication by an employee of the Dodge County Sheriff's Office, whose job duties included monitoring jail calls and who described how the jail's recording system operated. The State further called GBI Agent Eugene Howard to testify as an expert in gang language and to interpret the recordings, who explained that "the math" meant the phone number, that "stacked" meant snitched, and that "reach out" meant to talk to someone.

1. Before we turn to Appellant's enumerations of error, we must address three procedural issues in the trial court that

9

implicate our jurisdiction to hear this appeal. See *Gonzales v. State*, 315 Ga. 661, 662 (884 SE2d 339) (2023) ("It is incumbent upon the Court to question its jurisdiction in all cases in which jurisdiction may be in doubt." (cleaned up)). First, because the trial court entered an order on the motion for new trial before the judgment became final upon the trial court's grant of the State's pretrial motion for entry of an order of nolle prosequi on one theft-by-taking count, we must determine whether the trial court had the authority to do so. Second, we must consider whether the trial court properly entered the nolle pros order as to the theft-by-taking count before we issued the remittitur and the trial court entered it. Third, because Appellant did not file a second notice of appeal within 30 days of the entry of the nolle pros order, we must determine whether the notice of appeal was timely filed, which is a necessary predicate to our jurisdiction. Notwithstanding this procedural sequencing, we conclude that Appellant's appeal is properly before the Court.

(a) This is the second time that Appellant has appealed his convictions in this case. We dismissed Appellant's first appeal under

10

*Seals v. State*, 311 Ga. 739, 748 (860 SE2d 419) (2021), disapproved of on other grounds by *Gonzales*, 315 Ga. at 665 n.7, because one theft-by-taking count of the indictment remained unresolved, and thus the judgment was not final. See Case No. S23A0339 (Dec. 20, 2022) (Order dismissing appeal). *Seals* did not specifically address the question of what authority a trial court possesses to rule on a motion for new trial as to counts for which a defendant has been sentenced when other counts remain unresolved. However, we did state that "[u]nder existing practice, the far better course is to file and litigate a motion for new trial (during which the transcripts will be completed), and only then seek a certificate of immediate review in the event that the motion for new trial is denied." *Seals*, 311 Ga. at 750. This description is consistent with a trial court's general authority to rule upon properly filed motions while the case remains pending in the trial court. Cf. OCGA § 15-6-8 (1) (recognizing the power of superior courts to exercise original jurisdiction over criminal cases); OCGA § 15-6-8 (6) (stating that superior courts have authority "[t]o exercise such other powers, not contrary to the

11

Constitution, as are or may be given to such courts by law"); OCGA § 5-6-34 (b) (stating that trial courts may enter an order "not otherwise subject to direct appeal" and providing for procedure to appeal from such interlocutory orders). We now make clear that a trial court has jurisdiction to enter an order on a timely motion for new trial as to counts for which a defendant has been sentenced even when other counts remain unresolved. The fact that such an order is not final for purposes of appellate jurisdiction, see *Seals*, 311 Ga. at 748, has no bearing on the trial court's authority to enter it. Because there was no bar to the trial court here entering an order on the properly filed motion for new trial even though another count remained pending, our appellate jurisdiction is unaffected.[3]

---

[3] We acknowledge that we have previously dismissed at least two appeals in a similar procedural posture as Appellant's case, on the ground that "the order denying the motion for new trial was not legally valid because it was entered while the dead-docketed count remained pending." *Norris v. State*, 316 Ga. 119, 119 n.1 (884 SE2d 371) (2023) (describing order dismissing prior appeal). See also *Wheeler v. State*, 314 Ga. 484, 484 n.1 (877 SE2d 565) (2022) (explaining procedural history that included order dismissing prior appeal; vacating trial court order denying motion for new trial that had been entered before judgment became final upon entry of nolle pros order; and remanding for trial court to enter an order on the pending motion for new trial). We disapprove of *Norris* and *Wheeler* to the extent that they suggest that an order

(b) Second, we must address whether the trial court had authority to enter a nolle pros order before the return of the remittitur. In its codified preamble, the Appellate Practice Act ("APA") directs us to "liberally construe[ ]" it "so as to bring about a decision on the merits of every case appealed and to avoid dismissal of any case or refusal to consider any points raised therein, except as may be specifically referred to in this article." OCGA § 5-6-30. We therefore generally begin in each case otherwise properly within our jurisdiction with the premise that, absent legal authority or principles that prevent us from reaching the merits, we should reach the merits the parties raise. See id. And here, where the trial court issued a nolle pros order while an earlier appeal was pending, the only statutory directive that would prevent us from reaching the merits is OCGA § 5-6-45 (a).[4] That subsection provides that in

_____

denying a motion for new trial is invalid when it is entered while dead-docketed counts remain pending.

[4] As we explain later in this subdivision, when a supersedeas takes effect is also controlled by decisions from this Court explaining that notices of appeal usually act as supersedeas. See, e.g., *Sanders v. State*, 313 Ga. 191, 192 (869 SE2d 411) (2022) ("A notice of appeal generally divests the trial court of jurisdiction to alter the judgment or order that is being appealed.").

13

criminal cases, supersedeas applies only to "cases where a sentence of death has been imposed or where the defendant is admitted to bail"; otherwise, it is silent as to which actions by a trial court are precluded during the pendency of a criminal appeal. See OCGA § 5-6-45 (a). OCGA § 5-6-45 (a) is inapplicable here because Appellant did not receive a death sentence and is not out on bail. See *Sanders v. State*, 313 Ga. 191, 193 (869 SE2d 411) (2022) (explaining that OCGA § 5-6-45 (a) "means that the trial court cannot authorize the execution of a convicted defendant or, if the defendant is out on bail, require her to start serving her sentence while her appeal is pending"). Thus, reading OCGA §§ 5-6-30 and 5-6-45 (a) together, see *In the Interest of T. B.*, 313 Ga. 846, 852 (874 SE2d 101) (2022) (explaining that "codified preambles are part of the statutory act and appropriate to read in pari materia" (cleaned up)), we follow the APA's admonition to reach the merits of Appellant's case.

Moreover, we possess inherent power to protect our own jurisdiction. See Ga. Const. of 1983, Art. VI, Sec. I, Par. I (providing that "[t]he judicial power of the state shall be vested" in this Court,

14

among others); OCGA § 15-1-1 (stating that "[t]he judicial power is vested in such tribunals as are created by the Constitution of this state"). See also *Garcia v. Miller*, 261 Ga. 531, 532 (408 SE2d 97) (1991) ("This court has the inherent power essential to protect the judiciary as an independent branch of state government and to maintain a court system capable of providing for the administration of justice in an orderly and efficient manner."); *Wallace v. Wallace*, 225 Ga. 102, 111 (166 SE2d 718) (1969) ("That the courts possess certain inherent powers is a proposition which, so far as we know, has never been questioned. This means, then, when the [Georgia] Constitution declares that the legislative, judicial and executive powers shall forever remain separate and distinct . . . it thereby invests those officials charged with the duty of administering justice according to law with all necessary authority to efficiently and completely discharge those duties the performance of which is by the Constitution committed to the judiciary, and to maintain the dignity and independence of the courts." (cleaned up)). When action by a trial court could prevent us from hearing an appeal that we

15

otherwise have constitutional and statutory authority to decide, we may exercise our inherent power to protect our jurisdiction over that case. Cf. *In re Judicial Qualifications Comm'n Formal Advisory Op. No. 239*, 300 Ga. 291, 293 (794 SE2d 631) (2016) ("Jurisdiction refers to the types of cases the court can hear and decide. Power includes the authority to perform any function reasonably necessary to effectuate its jurisdiction[.]" (cleaned up)).

Consistent with the APA's admonition to decide appeals on the merits and keeping in mind our inherent power to protect our jurisdiction, we conclude that the trial court was authorized to nolle pros the theft-by-taking count before the return of the remittitur. This approach comports with "the general principle that the trial court is divested of jurisdiction to alter the judgment or order appealed from," *Sanders*, 313 Ga. at 194, because the nolle pros order here did not affect the counts of which Appellant was convicted and which were challenged on appeal.[5] Accordingly, we hold that we

---

[5] Consistent with this principle, the trial court has authority "to amend its own records, so as to make them conform to the truth" and "[t]o correct its

16

have jurisdiction over Appellant's case notwithstanding the entry of the nolle pros order before the return of the remittitur. Cf. *Felix v. State*, 271 Ga. 534, 534-535 (523 SE2d 1) (1999) (noting that the APA "was passed to simplify the procedure for bringing a case to the appellate court, and to secure speedy and uniform justice in a uniform and well-ordered manner; not to set traps and pitfalls by way of technicalities for unwary litigants" (cleaned up)). In doing so, we clarify that our decision today addresses only how the APA and its supersedeas provisions affect cases over which we otherwise already have jurisdiction.

(c) Finally, Appellant's first notice of appeal ripened upon the entry of the nolle pros order that made the judgment final, so it is not legally relevant that he did not file a second notice of appeal within 30 days after its entry. See *State v. Hood*, 295 Ga. 664, 664-

---

own proceedings before final judgment." OCGA § 15-1-3 (6)-(7). We also note that our approach is consistent with how federal courts handle this issue. See, e.g., *SEC v. Barton*, 79 F4th 573, 579 (5th Cir. 2023) (recounting "that the filing of a valid notice of appeal from a final order of the district court divests that court of jurisdiction to act on the matters involved in the appeal, except to aid the appeal" and other exceptions (cleaned up)).

665 (763 SE2d 487) (2014) (stating that a notice of appeal filed after final judgment, but before an order disposing of a motion for new trial, will ripen upon a trial court's denial of the motion for new trial). See also *Spears v. State*, 367 Ga. App. 92, 94-97 (883 SE2d 866) (2023) (holding that a notice of appeal, which was timely filed after the denial of the motion for new trial, ripened after the trial court issued a nolle pros order, even though the appellate court had dismissed the original appeal because of the existence of pending counts). Accordingly, we have jurisdiction to consider the enumerations of error raised.

2. (a) Appellant first claims that the evidence was constitutionally insufficient under *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979), but he is wrong. "On appeal, a criminal defendant is no longer presumed innocent, and we review whether the evidence presented at trial, when viewed in the light most favorable to the jury's verdicts, enabled the jury to find the defendant guilty beyond a reasonable doubt of the crimes of which [the defendant] was convicted." *Fitts v. State*, 312 Ga. 134, 141 (859

18

SE2d 79) (2021). "This limited review leaves to the jury the resolution of conflicts in the evidence, the weight of the evidence, the credibility of witnesses, and reasonable inferences to be made from basic facts to ultimate facts." *Wilkerson v. State*, 317 Ga. 242, 245 (892 SE2d 737) (2023) (cleaned up).

Here, the evidence presented at trial and recited in part above was plainly sufficient to authorize the jury to find Appellant guilty of each offense for which he was convicted. Although the evidence was conflicting, Martez's and Gary's pretrial statements to law enforcement and Kojack's testimony at trial inculpated Appellant, and the jury was free to discredit contrary evidence. See id. It is legally inconsequential whether Appellant fired all the fatal shots or stole all the items from the home because the jury was authorized to infer that he shared the criminal intent to perpetrate those crimes, and Appellant was part of the group that entered the Williamses' home armed with firearms to "hit a lick" while the Williamses were inside. See OCGA § 16-2-20 (defining party to a crime). See also *Rooks v. State*, 317 Ga. 743, 751 (893 SE2d 899) (2023) ("Conviction

19

as a party to a crime requires proof of a common criminal intent, which the jury may infer from the defendant's presence, companionship, and conduct with another perpetrator before, during, and after the crimes." (cleaned up)). The evidence recited above was constitutionally sufficient to authorize a rational jury to find Appellant guilty of malice murder, felony murder, home invasion, armed robbery, aggravated assault, burglary in the first degree, possession of a firearm during the commission of a felony, and theft by taking. See, e.g., *Jordan v. State*, 307 Ga. 450, 452-453 (836 SE2d 86) (2019) (holding that the evidence was sufficient to support malice murder and other convictions where the defendant agreed to participate in a home invasion as part of a gang, held the victim at gunpoint, "was observed laughing [with another member of the group] about the shooting," and spoke in jail about a person the defendant killed, and where the group took the victim's property from the house); *Overstreet v. State*, 312 Ga. 565, 571-572 (864 SE2d 14) (2021) (holding that the evidence was sufficient to authorize malice murder conviction where evidence indicated that the

defendant agreed with others to rob the victim, went to the victim's home carrying firearms, and shot the victim after demanding money, and that members of the group held the victim at gunpoint and searched the house for items to steal).

(b) Appellant also contends that the verdict was contrary to the principles of justice and equity and against the weight and sufficiency of the evidence. To the extent that Appellant seeks relief from this Court under the "general grounds" in OCGA §§ 5-5-20 and 5-5-21, this claim presents nothing for our review, see *Kimbro v. State*, 317 Ga. 442, 446 (893 SE2d 678) (2023), because "the decision to grant a new trial on the general grounds is vested solely in the trial court." *King v. State*, 316 Ga. 611, 616 (889 SE2d 851) (2023) (cleaned up). In its order denying Appellant's motion for new trial, the trial court stated that it reviewed the evidence and record and found that the verdict was "not contrary to the evidence or decidedly and strongly against the weight of the evidence" and that "the principles of justice and equity [did] not demand a new trial." Accordingly, Appellant's general grounds claim fails. See *Allen v.*

*State*, 315 Ga. 524, 531 (883 SE2d 746) (2023) ("Once we have determined that the trial court properly exercised its authority in refusing to grant a new trial on the general grounds, we cannot review the merits of that decision by the trial court." (cleaned up)).[6]

3. Appellant next maintains that the trial court abused its discretion by admitting recordings of Appellant's jail phone calls because the recordings lacked proper authentication and were unduly prejudicial. However, Appellant did not assert an objection based on lack of authentication below, and therefore his authentication argument is reviewable only for plain error. See OCGA § 24-1-103 (d). See also *Davis v. State*, 302 Ga. 576, 578-582 (805 SE2d 859) (2017) (applying plain error review where the defendant raised a different argument on appeal than the basis for his objection at trial). Plain error has four prongs:

First, there must be an error or defect — some sort of

---

[6] Although many of us continue to "question whether it is proper for this Court to import *Jackson* into an appellate review of the general grounds (or to otherwise rely on *Jackson* as part of that analysis)," we need not resolve that issue today because Appellant also argues that the evidence was constitutionally insufficient. *King*, 316 Ga. at 616 n.8. See also *Muse v. State*, 316 Ga. 639, 653 n.6 (889 SE2d 885) (2023).

22

deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Washington v. State*, 312 Ga. 495, 498 (863 SE2d 109) (2021) (cleaned up).

An audio-recording that is created

at a time when the device producing the items was not being operated by an individual person or was not under the personal control or in the presence of an individual operator shall be admissible in evidence when the court determines, based on competent evidence presented to the court, that such items tend to show reliably the fact or facts for which the items are offered[.]

OCGA § 24-9-923 (c). Here, the employee of the Dodge County Sheriff's office testified that her job duties included listening to jail calls; that an automated system recorded all jail calls and stored them on a server for four years; that the inmates entered a personal

23

identification number before calling; that Appellant used his own identification number when placing calls; that the system also tracked the phone numbers the inmates dialed; that the system accurately recorded the calls at issue when made; and that no one altered the recordings. In light of this testimony, the trial court was authorized to determine by a preponderance of the evidence that the recordings tended to reliably show that they were the contents of the calls that Appellant placed, and thus did not err, much less plainly err, in admitting them. See *Westbrook v. State*, 308 Ga. 92, 100-101 (839 SE2d 620) (2020) (rejecting, under plain error review, argument that audio recording of jail call was not properly authenticated where the State presented similar testimony as to the recording process); OCGA § 24-1-104 (a) ("Preliminary questions shall be resolved by a preponderance of the evidence standard."). See also *Reid v. State*, 306 Ga. 769, 778-779 (833 SE2d 100) (2019).

Additionally, the trial court did not abuse its discretion by overruling Appellant's objection under OCGA § 24-4-403 ("Rule 403"), which, in part, authorizes a trial court to exclude "relevant

24

evidence . . . if its probative value is substantially outweighed by the danger of unfair prejudice[.]" When

> reviewing the admission of evidence under Rule 403, we look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact. And it is well settled that the application of Rule 403 is a matter committed principally to the discretion of the trial courts, and the exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly.

*Salvesen v. State*, 317 Ga. 314, 317 (893 SE2d 66) (2023) (cleaned up). The recordings were highly probative because they illustrated consciousness of guilt. See *West v. State*, 305 Ga. 467, 471-475 (826 SE2d 64) (2019) (holding that audio-recordings of jail calls attempting to influence a juror were relevant, did not constitute improper character evidence, and were not unduly prejudicial as they tended to show the defendant's consciousness of guilt). And Appellant has not explained on appeal any danger of unfair prejudice that the recordings caused, nor do we see any. Cf. *Robinson v. State,* 308 Ga. 543, 551 (842 SE2d 54) (2020) ("Robinson points only to Rule 403 to support his claim, but other than noting

25

the gruesome nature of the video, he fails to explain how this portion of the video was unfairly prejudicial to him."). Thus, the trial court did not abuse its discretion.

4. Appellant next asserts that the trial court abused its discretion under Rule 403 by allowing GBI Agent Eugene Howard to testify as an expert in gang language. A defendant need not "be charged with criminal street gang activity before otherwise relevant evidence of gang activity may be admitted." *Richardson v. State*, 308 Ga. 70, 72 (838 SE2d 759) (2020) (cleaned up). "Like other evidence, the admission of evidence of gang activity is committed to the sound discretion of the trial court, and the court's decision to admit such evidence will not be disturbed on appeal absent an abuse of discretion." *Taylor v. State*, 304 Ga. 41, 46 (816 SE2d 17) (2018). Agent Howard explained the meanings of various words and phrases in Appellant's jail phone call recordings, such as "the math," "flipped," and "reach out to," which helped the State show that Appellant was unhappy with the prospective witnesses and wanted to talk to them before trial. Agent Howard's testimony was highly

probative because it helped the jury understand the unfamiliar terminology in the calls, and, properly understood, Appellant's statements using that vernacular showed that he wanted to speak with others because they were cooperating with the State in a manner that was unfavorable to him. See *Richardson*, 308 Ga. at 72 ("The letter was largely incomprehensible to someone unfamiliar with the vernacular of Richardson's gang, and the expert testimony was relevant (and had significant probative value) because it showed that the letter instructed [a person who knew about the crimes] to keep quiet about [the victim's] murder. And it was important to show that the letter was designed to keep [that person] quiet because Richardson's attempt to conceal his involvement in the crimes was evidence of his guilt." (cleaned up)). Lastly, the expert testimony was not unfairly prejudicial because the jury heard evidence that Appellant planned to form a gang, and that was the motivation for the crimes, so the testimony that Appellant was using gang language was unlikely to "inflame the passion of the jury for a reason that is irrelevant to the guilt or innocence of the defendant."

*Wilson v. State*, 315 Ga. 728, 739 (883 SE2d 802) (2023). See also

*Richardson*, 308 Ga. at 72 Accordingly, the trial court did not abuse

its discretion.

5. (a) Appellant further argues that the trial court's comments

at sentencing show that it plainly erred by sentencing him based on

"the concepts that are present in [Appellant's] world where life has

little to no meaning" rather than under Georgia law.[7] At the

sentencing hearing, the trial court stated:

> I thought that I would have a dilemma in sentencing you.
> I must balance what is a fair and appropriate sentence as
> it relates to you in your situation against the needs of the
> people of this state, this circuit, this county, and the city
> of Chester as justice requires. Though initially I thought
> my task would be difficult, I have resolved that it is not.
> The dilemma that I thought I would have was do I
> sentence Demarcus Deshawn Blash according to my
> worldly concepts of compassion and caring for life? But
> then it occurred to me how could anyone complain if I
> sentenced Mr. Blash [according] to the concepts that are
> present in his world where life has little to no meaning as
> reflected by the manner in which the Williamses's [sic]
> were murdered and your admission of guilt trying to
> influence witnesses by intimidation and that intimidation

---

[7] Appellant does not argue that the trial court's comments demonstrate bias or impartiality. Compare *Jackson v. State*, 315 Ga. 543, 552-555 (883 SE2d 815) (2023).

including the fear of death.

Appellant did not object, which deprives him of the ability to seek ordinary appellate review. And the trial court's remarks are not subject to plain error review, because they do not fall within one of the limited categories of alleged errors that the General Assembly has said can be reviewed for plain error. See *Keller v. State*, 308 Ga. 492, 497 (842 SE2d 22) (2020) ("This Court has declined to extend plain error analysis to other claims of error in the absence of a specific provision by the General Assembly.") Because none of the statutory bases of plain error review are present, we do not review Appellant's error as articulated.

(b) Nevertheless, Appellant cannot waive a voidness objection by failing to object at trial, so this Court will address Appellant's arguments to the extent that he challenges the voidness of his sentences. See *Marshall v. State*, 309 Ga. 698, 702-703 (848 SE2d 389) (2020). Appellant's sentences are not void because they fall within the statutory punishment ranges. See id; OCGA §§ 16-5-1 (e) (1) (outlining murder sentencing possibilities as death or life in

prison with or without parole); 16-7-1 (b) (providing that sentence range for burglary in the first degree is a prison term of between one and twenty years); 16-7-5 (d) (sentencing options for home invasion are "imprisonment for life or imprisonment for not less than ten nor more than 20 years and by a fine of not more than $100,000.00"); 16-8-12 (a) (1) (C) (stating that the punishment for theft by taking of property "at least $1,500.01 in value but . . . less than $5,000.00 in value" is "imprisonment for not less than one nor more than five years and, in the discretion of the trial judge, as for a misdemeanor"); 16-8-12 (a) (6) (B) ("If the property which was the subject of the theft offense was a . . . firearm, by imprisonment for not less than one year nor more than ten years[.]"); 16-8-41 (b) (declaring that sentencing choices for armed robbery are death, life in prison, or between ten and twenty years in prison); 16-11-106 (b) (setting punishment for possession of a firearm during the commission of a felony at "confinement for a period of five years, such sentence to run consecutively to any other sentence which the person has received").

6. Appellant contends that he was denied effective assistance of counsel due to his trial counsel's failure to object when the trial court allegedly did not sentence Appellant under Georgia law. To show that his trial counsel was ineffective, Appellant must demonstrate deficiency and prejudice. See *Evans v. State*, 315 Ga. 607, 611 (884 SE2d 334) (2023) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984)). Deficiency means trial counsel performed objectively unreasonably under all the circumstances and in light of prevailing professional norms. See *Strickland*, 466 U.S. at 687-688. We "must indulge a strong presumption" that trial counsel performed reasonably. Id. at 689. And to show prejudice, Appellant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. We need not address both prongs if Appellant fails to show either of them. See id. at 697.

"A trial court, in imposing a sentence, may consider any evidence that was properly admitted during the guilt-innocence

phase of the trial, as well as the conduct and attitude of the defendant during trial." *Wilson*, 315 Ga. at 741 (cleaned up). But "[a] trial court should not . . . take into account when sentencing any considerations that are not clearly shown by the evidence of record." *Blake v. State*, 273 Ga. 447, 450 (542 SE2d 492) (2001). Appellant has failed to show any prejudice from the trial court's statement that it was sentencing him according to "the concepts that are present in his world where life has little to no meaning." The statement Appellant points to is somewhat confusing, and the thrust of the trial court's consideration seems to be the "manner in which the Williamses were murdered" and the way Appellant tried to intimidate the witnesses. That information was in evidence and was proper for the trial court to consider. See *Wilson*, 315 Ga. at 740-741. Appellant was sentenced within the proper statutory ranges, and he has not shown that this stray comment from the trial court resulted in his sentences being higher than they would have been otherwise. Thus, he has not shown that he was prejudiced by counsel's failure to object to this comment, and his ineffectiveness

32

claim fails. See *Strickland*, 466 U.S. at 697 (explaining that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one").

7. We have identified two merger errors that harm Appellant and should be corrected. See *Dixon v. State*, 302 Ga. 691, 696-698 (808 SE2d 696) (2017) (recounting this Court's authority to sua sponte correct merger errors and explaining that we most commonly exercise that authority with respect to merger errors that harm a defendant). Counts 5 and 10 of the indictment charged Appellant with first degree home invasion and first degree burglary, respectively. First degree burglary does not require proof of any fact beyond those required to prove first degree home invasion. Compare OCGA § 16-7-1 (b) with OCGA § 16-7-5 (d). Therefore, Appellant's conviction for first degree burglary merged into the conviction for home invasion. See *Drinkard v. Walker*, 281 Ga. 211, 215 (636 SE2d 530) (2006) ("Under the required evidence test, . . . the applicable rule is that where the same act or transaction constitutes a violation

of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." (cleaned up)); *Washington*, 312 Ga. at 495 n.1 (noting that "the first degree burglary count merged with the first degree home invasion conviction"). Therefore, we vacate the sentence for first degree burglary.

Additionally, Counts 6 and 7 charged Appellant with armed robbery for taking Jain's and Wendell's firearms by force, and Count 12 charged Appellant with the theft by taking of "a firearm, the property of Jain and Wendell Williams." The theft by taking of the firearm should have merged, see *Wallace v. State*, 299 Ga. 672, 674 (791 SE2d 836) (2016), and therefore no sentence can be imposed on it. We accordingly also vacate Appellant's sentence as to theft by taking of the firearm.

*Judgment affirmed. All the Justices concur.*

34